611 A.2d 782

Janice L. DEMMY, Petitioner,

v.

PENNSYLVANIA STATE POLICE, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 10, 1992.

Decided June 5, 1992.

Anthony C. Busillo, II, for petitioner.

Michael S. Sherman, Asst. Counsel, for respondent.

Before DOYLE, and FRIEDMAN, JJ., and LORD, Senior Judge.

LORD, Senior Judge.

Janice L. Demmy appeals to this Court from the determination made by the Commissioner of the Pennsylvania State Police (PSP) that she is physically unfit to carry a lethal weapon. Since 1980, Demmy has been employed by General Public Utilities Nuclear Company (GPU) at the Three Mile Island Nuclear Generating Station as an armed security guard. The PSP administers the Lethal Weapons Training Act (LWTA), Act of October 10, 1974, P.L. 705, *as amended,* 22 P.S. §§ 41–50.1, which provides for the training and licensing (*i.e.* certification) of privately employed armed security guards and investigators.

Demmy was certified pursuant to the provisions of the LWTA in 1980 and was recertified in 1985 and 1990. 37 Pa.Code § 21.11(3)(iv) requires all persons desiring certification to "have a visual acuity of at least 20/70, uncorrected in the stronger eye, correctable to at least 20/20; and 20/200, uncorrected in the weaker eye, correctable to at least 20/40 . . . ."

On February 6, 1991, Dr. Mark Mastervich examined Demmy and determined that her corrected vision is 20/20 in both eyes; however, her uncorrected vision is 20/800 in her right eye and 20/1000 in her left eye. These levels of uncorrected vision do not conform to the visual acuity requirements set forth in the Code.

The PSP notified Demmy on February 13, 1991, that her Lethal Weapons Certification was to be revoked because she no longer physically qualified for certification based on the results of her eye examination. Demmy made a timely request for an administrative hearing, and such hearing was held on May 8, 1991.

At the hearing, Demmy argued that her vision conforms to the federal regulations promulgated by the Nuclear Regulatory Commission (NRC) governing visual acuity for armed security at nuclear power plants. Demmy contended that the federal regulations pre-empt the regulations promulgated pursuant to the LWTA; therefore, she was entitled to carry a lethal weapon while working at GPU. Demmy also presented the argument that she was entitled to certification because her physical circumstances had not changed from the time of her original certification when there were no visual acuity standards.

On August 1, 1991, the hearing examiner sustained the revocation of Demmy's certification. The Commissioner of the PSP concurred with the hearing examiner's findings and, based on the results of Demmy's eye examination, found that she was not qualified for certification. This appeal followed.

■ Demmy's first argument in this appeal arises from the admitted fact that she meets the NRC's standards for visual acuity. From that fact Demmy argues that the federal regulations regarding the required visual acuity have pre-empted this field and, therefore, any state regulations may not lawfully be applied to deprive her of her security guard position.

In order to fully examine this interesting argument, it is necessary to evaluate some of the general principles applicable to the question of pre-emption.

Both parties have cited to us *Pacific Gas & Electric v. Energy Resources Conservation and Development Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), a case involving pre-emption by virtue of the Atomic Energy Act (AEA), 42 U.S.C. §§ 2011–2296 (1954) also involved here. Thus, we turn to that case for the general preemption principles. In *Pacific Gas,* the United States Supreme Court said:

It is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms. *Jones v. Rath Packing Co.,* 430 US 519, 525, 51 L Ed 2d 604, 97 S Ct 1305 [1309] (1977). Absent explicit pre-emptive language, Congress' intent to supersede

state law altogether may be found from a " 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' because the Act 'of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.' " *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 US 141, 153, 73 L Ed 2d 664, 102 S Ct 3014 [3022] (1982), quoting *Rice v. Santa Fe Elevator Corp.*, 331 US 218, 230, 91 L Ed 1447, 67 S Ct 1146 [1152] (1947). Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 142–143, 10 L Ed 2d 248, 83 S Ct 1210 [1217–1218] (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 US 52, 67, 85 L Ed 581, 61 S Ct 399 [404] (1941). *Id.* at 203–204, 103 S.Ct. at 1722.

The Court then held:

Congress, in passing the 1954 Act and in subsequently amending it, intended that the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant, but that the States retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost, and other related state concerns. *Id.* at 205, 103 S.Ct. at 1723.

The Court further opined: " 'So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice v. Santa Fe Eleva-*

*tor Corp.,* supra, at 230, 91 L Ed 1447, 67 S Ct 1146 [at 1152]." *Id.* at 206, 103 S.Ct. at 1723.

The Supreme Court then held that a California statute conditioning the construction of nuclear plants on the State Energy Resources Conservation and Development Commission's findings that adequate storage facilities and means of disposal are available for nuclear waste was not pre-empted by the AEA when construed to have an economic purpose.

Obviously, the question Demmy presents to this Court does not have the breadth or universal importance of the relationship between the AEA and the California statute mentioned above, but that fact does not detract from its importance to the parties involved.

The question at issue here is whether the AEA and the regulations adopted thereto are so pervasive that the state's more stringent visual acuity requirements to carry firearms, embodied in 37 Pa.Code § 21.11(3)(iv) and implemented pursuant to the LWTA's provisions, must be held unconstitutional. We think not for the following reasons.

First, the AEA itself does not have explicit terms which pre-empt state authority. This point is illustrated by the Supreme Court's opinion in *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Although, in her argument before us, Demmy has cited and relied heavily upon certain language in that case, an examination of the opinion of Justice Douglas reveals it does not support Demmy's position. Rather, the Court's reasoning in *Rice* is bottomed on specific language in an amendment to the United States Warehouse Act, 7 U.S.C. §§ 241–273 (1916) which gave exclusive power to the Secretary of Agriculture, while the original Act "made federal regulation in [the] field subservient to state regulation." *Id.* at 222, 67 S.Ct. at 1148. Indeed, the original Warehouse Act contained language more akin to Section 2021(k) of the AEA, 42 U.S.C. § 2021(k), which reads: "Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." This lan-

guage indicates non-supremacy of the AEA rather than pre-emption.

Second, the Supreme Court has undoubtedly held that one who espouses the proposition that a federal *regulation* is supreme, as Demmy does here, bears a heavier burden than one who advances the supremacy of a statute. In *Hillsborough County v. Automated Medical Laboratories,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), the Court said:

> We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence. See *Jones v. Rath Packing Co.,* 430 US at 525, 51 L Ed 2d 604, 97 S Ct 1305 [at 1309]. *Id.* at 717, 105 S.Ct. at 2377.

And, again, in answer to Demmy's argument concerning the comprehensiveness of the NRC's regulations, the Supreme Court said in *Hillsborough:*

> Moreover, because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to pre-empt. Given the presumption that state and local regulation related to matters of health and safety can normally coexist with federal regulations, we will seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-

empt in its entirety a field related to health and safety. *Id.* at 718, 105 S.Ct. at 2377.

Third, we note that the federal regulations involved here can coexist with the state's mandate. All that the state has done is imposed a more stringent visual acuity requirement for those persons who seek to carry guns as armed personnel privately employed throughout the Commonwealth. Although, unfortunately, this requirement works an extreme hardship on Demmy as an individual, we cannot allow our sympathy for her to interfere judicially with the state's determination of the visual acuity necessary for certified agents.

We therefore reject Demmy's constitutional claim.

■ Moreover, because we have decided that federal preemption does not operate in this instance, we must consider Demmy's next argument that the requirements of 37 Pa.Code §§ 21.5 and 21.21 have been misapplied to this case.[1]

Demmy argues that "[b]oth §§ 21.5 and 21.21 are preconditioned on the existence of a change since prior certification." (Petitioner's brief at 19). She contends that, because there were no requirements to submit to a physical examination for the purpose of determining visual acuity at the time of her original certification or at the time of her recertification, the PSP has failed to meet its burden of proving that Dem-

1. § 21.5. Certified agent/applicant responsibilities.
 When a certified agent or applicant has a change in physical, psychological, or criminal history circumstances which would have prohibited certification, he shall immediately forward written notification of the change to the Department. When a certified agent or applicant changes his address, he shall forward written notification of the change to the Department within 5 days.
 § 21.21. Conditions of certification.
 When there is reasonable cause to believe that a certified agent has had a change in physical or psychological circumstances which would render the agent ineligible for original certification, the following action must be taken:
 (1) Physical reexamination. A written notice will be issued informing the agent that he must undergo a physical examination conducted by a physician at the agent's expense. The examination must be identical to the original physical examination which is required for initial certification. The examining physician must submit the physical examination form as prescribed by § 21.11 (relating to applicant qualification requirements).

my's certification to carry a lethal weapon must be revoked due to a change in her physical condition.

We reject this argument and, instead, agree with the PSP that the posture of the language "which would render" as it relates to original certification dictates an interpretation that the standards for original certification to be applied under § 21.21 are those standards which must presently be met under § 21.11(3)(iv). As the PSP also points out, § 21.21(1) specifically provides that "[t]he examination must be identical to the original physical examination which *is* required for initial certification." (emphasis added). This language is conveyed in the present tense and can only be interpreted as prescribing a present application of the standards for original certification.[2]

Any contention that the PSP has failed to meet its burden because it has not proven a change in Demmy's physical condition from the time of prior certification is, therefore, specious where Demmy was not previously required to submit to a physical examination for the purpose of determining visual acuity. The change which must be proven, then, is that, although Demmy was once eligible for certification, now she is not.

Because Demmy, having undergone a physical examination pursuant to § 21.21, does not meet the presently existing standards for visual acuity, we agree with the Commissioner that her Lethal Weapons Certification must be revoked. The PSP's interpretation of this Code provision is, in this instance, entitled to our deference as it is especially practical and logical in light of the legislature's concern for citizen safety in enacting the LWTA and the obvious conclusion that the now-existing standards for original certification must be our guide in promoting the purpose of the Act. *See Michael Manor, Inc. v. Department of Public Welfare,* 88 Pa.Commonwealth Ct. 583, 490 A.2d 957 (1985).

Accordingly, we affirm.

**2.** The fact that the language relating to certification in § 12.5 is in the past tense does not change our interpretation of the language in § 21.21, which clearly implicates standards for *original* certification as they now exist. § 12.5, in our opinion, relates to certification *generally.*

## ORDER

AND NOW, this 5th day of June, 1992, the final determination of the Commissioner of the Pennsylvania State Police, dated August 23, 1991, is affirmed.