Genevieve Osterdale SCHULTZ, Plaintiff,

v.

Gary AULD, individually; Jean E. Peeters, jointly and severally; Peeters Transportation Co., Inc., jointly and severally; Mayflower Transit, Inc., jointly and severally; and John Parcher, individually, Defendants.

No. CV92–345–S–MHW.

United States District Court,
D. Idaho.

Oct. 25, 1993.

Robert Korb, III, Sheila P. John, for plaintiff Genevieve Osterdale Schultz.

William A. McCurdy, Michael P. Stefanic, II, for defendants Gary Auld, Jean E. Peeters, Peeters Transp. Co., Inc., Mayflower Transit, Inc., and John Parcher.

WILLIAMS, United States Magistrate Judge.

## Introduction

This matter is before the Court by consent of the parties and Judge Harold L. Ryan's

Order of Reassignment pursuant to 28 U.S.C. § 636(c). Currently before the Court is Defendants' Motion to Dismiss (Dkt. # 38). Defendants move the Court under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Complaint on the grounds that it failed to state a claim upon which relief can be granted. As Defendants have included matters outside the pleadings, the Court will consider this motion as one for summary judgment under Rule 56.

## Procedural History

Plaintiff filed her original Complaint in this action on August 10, 1992, in the Fifth Judicial District of the State of Idaho. Defendants removed it by Notice of Removal filed with this Court on August 28, 1992. Plaintiff filed her Amended Complaint and Demand for Jury Trial on May 20, 1993, and her Second Amended Complaint and Demand for Jury Trial on August 11, 1993.

The Second Amended Complaint alleges: violations of the Idaho Consumer Protection Act (First and Second Causes of Action); negligence (Third, Fourth, Eleventh and Twelfth Causes of Action); breach of contract (Fifth, Eighth and Ninth Causes of Action); and intentional torts of misrepresentation, fraud, and conversion (Sixth and Seventh Causes of Action). Plaintiff's Tenth Cause of Action seeks attorney fees and costs of litigation.

Defendants have moved to dismiss all claims against them on the basis that Plaintiff's state and common law claims are preempted by the Carmack Amendment, 49 U.S.C. § 11701, *et seq.*

## Background

In early July 1991, Plaintiff contacted Mayflower Transit, Inc. (Mayflower), through its agent Peeters Transportation, Inc. (Peeters), to inquire about moving her household belongings from San Francisco, California, to her new residence in Hailey, Idaho.

On or about July 8, 1991, John Parcher, a Peeters representative, met with Plaintiff at her apartment in San Francisco. After hav-ing viewed and inspected Plaintiff's household effects, he wrote a table of measurements.[1] Defendants claim, and Plaintiff disputes, that during this meeting, Parcher explained the carrier's legal liability of 60 cents per pound, per article, as well as other value protections available to her, including declared value protection and full replacement value protection. Defendants maintain that Plaintiff specifically chose the 60–cents–per-pound, per-article valuation for the move. Defendants also claim, and Plaintiff disputes, that Parcher provided Plaintiff with a moving kit as required under 49 C.F.R. § 1056.2(a), which included a booklet, known as Publication OCP–100, entitled "Your Rights and Responsibilities When You Move."[2]

Following the meeting, Parcher returned to his office where he calculated the "Estimated Charges," based on 60 cents per pound, per article. Parcher then returned to Plaintiff's apartment and hand delivered the Estimated Charges to her. As Peeters' estimate was lower than the others Plaintiff had received, she contacted Peeters and authorized the move. Parcher then prepared a document entitled "Order for Service," in which he wrote the carrier's legal liability to be 60 cents per pound, per article. The terms of the Order of Service provided an additional opportunity to chose between full replacement value protection, declared value protection, or carrier's legal liability of 60 cents per pound, per article.[3]

On July 16, 1991, Parcher returned to Plaintiff's apartment and presented her with the Order for Service. Plaintiff signed the Order for Service along with a credit card slip in the amount of $1,817.47 to charge the cost of the move to her American Express account. Plaintiff specifically signed the Order for Service in the space which limits the carrier's legal liability to 60 cents per pound, per article. However, she claims to have received no information whatsoever with respect to options of liability limits and also maintains that she was not informed that she had the responsibility to select the limit to

---

1. *See,* Affidavit of John Parcher, Exhibit A.

2. *Id.,* Exhibit B.

3. *Id.,* Exhibit D.

apply in case of loss or damage to her goods during the move.

Plaintiff flew from San Francisco to Hailey the next day, having asked her son, Geoffrey, to be present at her apartment on the day Peeters arranged to load her shipment. On July 19, 1991, Defendant Gary Auld (an independent contract truck driver on Mayflower's dispatch) was dispatched to Plaintiff's San Francisco apartment to pick up Plaintiff's household goods. Geoffrey was there, let Auld in, and proceeded to help him load boxes. Geoffrey filled in the words ".60/L.B." in the space releasing his mother's shipment to that value on the Bill of Lading, dated it and signed his name as shipper. Geoffrey claims that Auld instructed him to fill in ".60/L.B." and that he had no reason to question that instruction as he believed his mother had concluded all the arrangements for her move.

Auld arrived in Hailey, Idaho, on July 26, 1991, with Plaintiff's shipment. He met Plaintiff and her son, Chris, at Plaintiff's apartment. Plaintiff and Chris decided that some of her belongings were to be taken to a mini storage unit. Over the course of the afternoon, Auld and Chris made several trips with excess furniture to the storage facility and unloaded the items into the storage unit.

Auld unloaded the rest of Plaintiff's personal property at her apartment, including all of the cardboard wardrobe boxes. At some point, Plaintiff informed Auld that one wardrobe box had been damaged and that four brass legs were missing from a piece of furniture.

Defendants claim that Auld returned to Plaintiff's apartment the next morning; Plaintiff claims that he did not return until August 1, 1991. When he did return, Auld delivered the missing cabinet legs. He also inquired whether Plaintiff had received a headboard by mistake. Plaintiff told him it was not in her apartment, but that he could check her storage unit in case it had accidentally been left there.

Defendants claim that Plaintiff then asked Auld to help her empty clothes from a damaged wardrobe (which had been crushed on one side and contained mainly skiwear) into an empty undamaged wardrobe and remove various other items of winter clothing from Plaintiff's closet and add them to the undamaged wardrobe. Plaintiff claims that Auld had suggested combining the wardrobes but that she had only opened the top of the second wardrobe in order to identify its contents. She maintains that it contained designer clothes, some of which were new with the retail tags still attached.

Plaintiff then asked Auld to transport the wardrobe boxes to the storage facility, and he agreed to do so. No formal paperwork was exchanged between Auld and Plaintiff with respect to this arrangement.

According to Plaintiff, Auld loaded the two wardrobes onto his van and drove them, along with Plaintiff, to the storage unit. She claims that she was unable to open the unit, so she and Auld returned to her apartment, with the wardrobes left in the van. Plaintiff then tried to contact Chris from her apartment to have him open the storage unit lock. She maintains that Auld stayed in her apartment for several hours and the two engaged in small talk. Eventually Auld asked Plaintiff if he could borrow a broom in order to sweep out his van. When he returned from the van, he brought a box which contained Plaintiff's best china. He then unloaded some custom bedspreads and pads.

By late in the afternoon, Chris had neither arrived nor called. Plaintiff claims that it was at this point that Auld told her that he needed to get on his way and suggested that he could combine the contents of both wardrobes into one and leave it at the storage facility.

Auld claims that he arrived at the storage facility and waited there for Chris for approximately two hours. At that point, Auld asked an employee of the storage facility if he could leave Plaintiff's wardrobe box in the custody of the facility and explained that Chris was expected to arrive shortly. The employee agreed and placed Plaintiff's wardrobe in a room adjacent to the storage company's business office. Auld understood that this room, which contained tools and other miscellaneous boxes, was accessible only to the facility's personnel. Auld then left Hailey en route to another delivery.

The next day Plaintiff realized that both wardrobes had been quite full and believed it would have been impossible to combine their contents. She went to her storage unit to see if both wardrobes were safe and asked Bing Copeland, one of the owners, to accompany her to her storage unit. They found only the crushed wardrobe which had contained mostly skiwear, some of which Plaintiff claims was missing. The second wardrobe was not there.

Plaintiff claims that she was extremely upset and alarmed at the loss of her very expensive designer clothing and immediately telephoned Peeters in San Francisco. She told the person who answered that the driver had left with a wardrobe containing very expensive clothing and demanded that he be intercepted; the person hung up on her.

Over the next several weeks, Plaintiff finished unpacking. During this process she discovered that a laptop combination radio/television and a box of spices was missing. She also discovered breakage and damage to various other articles.

Plaintiff alleged damage to and loss of some of her personal property and made a claim for those damages to Mayflower; she submitted a claim form to Mayflower for a total loss of $12,736.97, $11,340.00 of which was the purchase cost of the designer clothing. Mayflower responded in writing on January 10, 1992, and offered to pay Plaintiff an amount for damages in accordance with the limitation of carrier's liability of 60 cents per pound, per article.[4] Mayflower offered $90.00, based on the 60-cents-per-pound, per-article limit. Plaintiff refused the amount offered and demanded damages in excess of that limitation.

At all times relevant to this action, Mayflower maintained approved tariff rates with the Interstate Commerce Commission.[5]

### Standard for Summary Judgment

Defendants filed the present motion as a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, as Defendants have included matters outside the pleadings, Rule 12(b) directs that the Court to treat the motion as one for summary judgment to be disposed of as provided by Rule 56.

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (1993). A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

"When determining if a genuine factual issue ... exists, ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* at 249–250, 106 S.Ct. at 2513. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment, *see e.g., Musick v. Burke*, 913 F.2d 1390 (9th Cir.1990); *Pelletier v. Federal*

---

4. *See* Defendants' Statement of Uncontested Facts, Exhibit 2.

5. *See* Defendants' Statement of Uncontested Facts, Exhibit 1.

*Home Loan Bank,* 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe,* 633 F.2d 531 (9th Cir.1980), and has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.,* 976 F.2d 497 (9th Cir.1992).

### Discussion and Analysis

Defendants' motion is premised on the doctrine of federal preemption. Specifically, they point to the Carmack Amendment, 49 U.S.C. § 20(11), *repealed* and *recodified by* 49 U.S.C. § 11707, which Defendants maintain preempts the state statutory and common law claims as alleged by Plaintiff.

*1. Application of Preemption.*

■ Federal law preempts state and common law where it can be established that Congress so intended. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). It is not necessary for a federal statute to provide explicitly the state laws which are preempted. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Preemption may be inferred where Congress has legislated so comprehensively that it has left no room for supplementary state legislation. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230, 67 S.Ct. at 1152., and preemption may be inferred where state regulation would impede the very purpose and objectives of Congress as expressed in their legislative enactment. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. at 713, 105 S.Ct. at 2375.

The United States Supreme Court addressed the preemptive scope of the Carmack Amendment in *Adams Express Co. v. Croninger,* 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913). At issue in that case was whether states could regulate carrier liability. The plaintiff argued that the nonexclusive character of the Amendment allowed for state legislation on the same subject and that a shipper of goods could resort to any right of action. The Court disagreed and held:

Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it.

*Id.* at 505–506, 33 S.Ct. at 152.

■ Virtually every circuit to address this issue has held that the Carmack Amendment preempts state law remedies for loss or damage to goods shipped by common carriers. *See, e.g., Hughes v. United Van Lines, Inc.,* 829 F.2d 1407 (7th Cir.1987) (state common law causes of action including allegations of negligence, breach of insurance contract, breach of contract of carriage, conversion, intentional misrepresentation, negligent misrepresentation and negligent infliction of emotional distress preempted by the Carmack Amendment); *Air Prods. & Chems., Inc. v. Illinois Cent. Gulf. R.R.,* 721 F.2d 483 (5th Cir.1983) (the Carmack Amendment, as judicially interpreted, provides an exclusive remedy for a breach of contract of carriage provided by a bill of lading); *W.D. Lawson & Co. v. Penn Central Co.,* 456 F.2d 419 (6th Cir.1972) (the Carmack Amendment preempts common law suits); *R.H. Fulton v. Chicago, Rock Island & Pacific Railroad Company.,* 481 F.2d 326 (8th Cir.1973) (when damages are sought against a common carrier for failure to properly perform, or for negligent performance of, an interstate contract of carriage, the Carmack Amendment governs); *American Synthetic Rubber Corp. v. Louisville & N.R.R. Co.,* 422 F.2d 462 (6th Cir.1970) (same); *Underwriters at Lloyds of London v. North American Van Lines,* 890 F.2d 1112 (10th Cir.1989) (state common law remedies preempted by Carmack Amendment).

One of the most recent courts to address the issue was the Ninth Circuit in *Hughes Aircraft Company v. North American Van Lines, Inc.,* 970 F.2d 609 (9th Cir.1992). In that case, Hughes and North American agreed to a contract under which North American was to transport household products for Hughes employees and certain "high value" products for the aerospace firm. The contract established a tariff along with tables which specified a per pound shipping charge and included a footnote at the bottom of each

page that purported to limit North American's liability to $.60 per pound, per article. Pursuant to the contract, Hughes contacted North American's local agent to arrange transportation of a computer leased by Hughes from a company called EDS. The computer was comprised of 15–20 pieces and weighed approximately 25,000 pounds. The driver fell asleep at the wheel during the interstate drive and the truck overturned. The accident resulted in substantial damage to the computer system and Hughes became liable to EDS for $2.5 million. In addition, deprivation of access to the computer caused losses to Hughes in excess of $250,000 due to business interruption.

North American offered Hughes $12,408.00 for the damages suffered. Hughes refused and sued for breach of contract, negligence, and for recovery under the Carmack Amendment. The Ninth Circuit recognized that Hughes' state common law claims were preempted:

C. Is Hughes' negligence cause of action preempted by the Carmack Amendment? Hughes wisely conceded that federal law preempts any state common law action against North American acting solely as a common carrier. It is clear that the Carmack Amendment establishes a uniform national liability policy for interstate carriers. [Citations omitted].

*Hughes Aircraft Company v. North American Van Lines, Inc.,* 970 F.2d at 613.

■ Plaintiff argues that her causes of action under the Idaho Consumer Protection Act are not preempted because Congress did not occupy the field of consumer protection when it enacted the Interstate Commerce Act or the Carmack Amendment. In support of this position, Plaintiff relies primarily on *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931 (Tex.1980) and *Sokhos v. Mayflower Transit, Inc.,* 691 F.Supp. 1578 (D.Mass.1988).[6]

In *Brown,* the Texas Supreme Court held that a suit based on misrepresentations made prior to execution of an interstate contract were not preempted by federal law. As Defendants suggest, however, this opinion is clearly inconsistent with decisions of the United States Supreme Court and the federal circuits to have directly addressed the issue. Decisions more recent than those on which Plaintiff relies have uniformly upheld the preemptive effect of the Carmack Amendment and that the application of a state's deceptive trade practices act is totally incongruous with the purposes of the Carmack Amendment. *See, Margetson v. United Van Lines, Inc.,* 785 F.Supp. 917 (D.N.M. 1991); *Suarez v. United Van Lines, Inc.,* 791 F.Supp. 815 (D.Colo.1992); *Carr v. United Van Lines, Inc.,* 289 S.C. 194, 345 S.E.2d 734 (1986); *Malone v. Mayflower Transit, Inc.,* 819 F.Supp. 724 (E.D.Tenn.1993).

Furthermore, if this Court were to adopt Plaintiff's position, the uniformity and certainty of the national scheme would be compromised. The position asserted by Plaintiff would enable one moving from any state to the state of Idaho to proceed under the Idaho Consumer Protection Act. Such a rule would create an entirely new scheme of potential liability for a carrier, as the right to assert additional causes of action would fortuitously depend on from where or to where the shipper moved. It is not difficult to imagine that every suit brought against a carrier of household goods would include allegations of intentional conduct or fraud in an effort to avoid the preemptive effect of the Carmack Amendment. Moreover, to account for increased liabilities occasioned by the exception, carriers would necessarily be required to increase their rates, thus further defeating congressional policy to encourage reasonable rates for transportation. 49 U.S.C. § 10101.

■ Plaintiff next argues that the Carmack Amendment has no application to shipments between two points in the same state, *German v. Chicago, M. & S.P. R. Co.,* 276 S.W. 1041 (Mo.App.1925), and attempts to distinguish her move between San Francisco to Hailey from the subsequent transfer of household goods between her Hailey apart-

**6.** As Defendants point out, the *Sokhos* court relied on *Reed v. Aaccon Transportation, Inc.,* 637 F.2d 1302 (10th Cir.1981), which was expressly overruled by *Underwriters at Lloyds of London v. North American Van Lines,* 890 F.2d 1112 (10th Cir.1989).

ment and her Hailey storage unit. She characterizes the latter as an informal, undocumented reconsignment, entirely intrastate, and thus falling outside the preemptive effect of the Interstate Commerce Act. On that basis, Plaintiff maintains that her state causes of action are cognizable as to that portion of her move and the losses attributable to it, based on her position that a private contract essentially arose between Auld and Plaintiff (in consideration for Plaintiff's willingness to help Auld search for the headboard at the storage unit, Auld agreed to transport the two wardrobes to the unit).

The parties dispute whether Auld returned the day immediately following or a week later, but do not dispute that when Auld moved some of Plaintiff's personal property between her apartment and storage unit, he did not fill out a bill of lading or complete any other documentation.

In the context of Plaintiff's entire move, the difference between whether Auld returned a day later and a week later is immaterial. What is material is that the goods transported from the Plaintiff's apartment to the storage unit were the same goods Auld had hauled from San Francisco to Hailey. Delivery of those same goods to the storage unit was within the ambit of the interstate move and an extension of the reasonable intent of the parties to transport the goods from San Francisco to Hailey.

■ Plaintiff next asserts that as Parcher, rather than Plaintiff or her agent, wrote in $.60 on the Order of Service, Defendants' claim of preemption under the Carmack Amendment should be precluded.

Parcher's act of writing in $.60 does not preclude preemption; the Bill of Lading, not Order for Service, is the legally binding document. *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir.1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988); *Margetson v. United Van Lines, Inc.,* 785 F.Supp. 917, 921 (D.N.M.1991).

In addition, Plaintiff herself signed the Order for Service after Parcher had written in the $.60 valuation. The Bill of Lading was signed by Plaintiff's agent, her son, Geoffrey, who filled in the $.60 per pound limitation.

*2. Enforceability of the Limitation of Liability.*

■ Defendants argue that even if Plaintiff's claims for damages were pled as Carmack Amendment claims, they must be dismissed as her damages are limited to $.60 per pound, per article, which is the amount already offered by Defendants. Plaintiff raises several arguments in an effort to void the liability limitation.

Plaintiff argues first that Parcher failed to provide her with the information necessary to advise her of her right and responsibility to select a liability limit. She argues further that the fact that Geoffrey failure to fill in the words "$.60 per pound, per article" rather than simply ".60/LB" is a technical flaw that is fatal to the limitation of liability in the Bill of Lading.

■ The filing of a tariff alone does not limit a carrier's liability, as a shipper must be given a reasonable opportunity to choose to accept a carrier's proposed limit. *Hughes Aircraft Co. v. North American Van Lines, Inc.,* 970 F.2d 609 (9th Cir.1992). Reasonable opportunity to choose between different levels of coverage means that:

> [T]he shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Carmana Designs,* 943 F.2d at 320 (quoting *Bio–Lab, Inc. v. Pony Express Courier Corp.,* 911 F.2d 1580, 1582 (11th Cir.1990)).

*Hughes Aircraft Co. v. North American Van Lines, Inc.,* 970 F.2d at 612.

It is undisputed that Plaintiff received the original Estimate of Charges prepared by Parcher. The estimate, which was based on a $.60 per pound transportation valuation and binding on Mayflower, provided that Plaintiff's move would cost $1,817.47. Based on this estimate, Plaintiff ultimately accepted the Estimate of Charges and authorized Mayflower to move her personal belongings to Idaho.

Plaintiff also received the Order for Service which Parcher had prepared. Available

valuation protections are fully explained on the back of the Order for Service.[7] Consistent with the valuation as stated on the Estimate of Charges, Parcher wrote in "60 [cents]" on the line provided for carrier's liability. Plaintiff ultimately signed on the line designated for the shipper's signature for carrier liability, as well as on the line designated for the signature of the shipper or shipper's authorized agent at the bottom of the Order for Service. Her signature on the bottom line also acknowledges receipt of the OCP–100 booklet, which explains the valuations available.

To the extent Plaintiff seeks to avoid the legal effects of her signature on the basis that she is elderly and has vision difficulties, *i.e.*, did not know what she was signing, Plaintiff is reminded that in Idaho, it is well-established that a person who has executed a contract is presumed capable of understanding the nature and effect of such contract. *Liebelt v. Liebelt,* 118 Idaho 845, 801 P.2d 52 (Ct.App.1990). Moreover, a written contract cannot be avoided by one of the parties on the grounds that he or she signed it without reading it and did not understand it. *Id.* Failure to read the contract or to have it read to him or her or otherwise inform him or herself as to the nature, terms, and conditions of the contract constitutes nothing more than gross negligence on the part of that party and is insufficient grounds upon which to set a contract aside. *Id.*

The phrases "$.60 per pound" and "$.60 per pound, per article" are used interchangeably when reference is made to the $.60–per–pound, per-article limitation. *See e.g., Underwriters at Lloyds of London v. North American Van Lines,* 890 F.2d 1112 (10th Cir.1989) (shipper inserted the phrase "$.60 per pound" rather than "$.60 per pound, per article" and court used phrases interchangeably); *Rocky Ford Moving Vans, Inc. v. United States,* 501 F.2d 1369 (8th Cir.1974) (court used phrases interchangeably).

It is undisputed that Plaintiff signed her name on the Order for Service in the space which limits the carrier's legal liability to the rate of $.60 per pound, per article. It is also undisputed that Plaintiff's son Geoffrey, acting as Plaintiff's agent, wrote ".60/LB" on and. then signed the Bill of Lading.

Under these circumstances, the Court concludes that Plaintiff had both reasonable notice and the opportunity to obtain information, and the opportunity to make a deliberate and well-informed choice and valuation. Geoffrey's shorthand version of ".60/LB" is merely a minor technical distinction and does not void the liability limitation. As Plaintiff chose the $.60–per–pound, per-article choice, she should be held to it.

Finally, Plaintiff attempts to avoid the preemptive effect of the Carmack Amendment by asserting that it does not exempt Defendants from loss resulting from gross negligence, fraud, or intentional torts, particularly conversion.

It is well-established that if a liability limitation is valid, recovery for damages cannot exceed the released value, regardless of the degree of the carrier's negligence. *Southeastern Express Co. v. Pastime Amusement Co.,* 299 U.S. 28, 29–30, 57 S.Ct. 73, 74, 81 L.Ed. 20 (1936); *Deiro v. American Airlines, Inc.,* 816 F.2d 1360 (9th Cir.1987).

On the issue of fraud, Plaintiff asserts that Defendants perpetrated fraud by virtue of various representations and/or omission made with respect to various aspects of her move. As discussed previously, however, the overwhelming weight of authority supports

7. The available valuation protections include plan A, full value protection with no deductible; plan B, full value protection with a $300 deductible; Mayflower Transit's full value protection; declared value protection; and carrier's liability—60 cents per pound, per article. The carrier's liability option reads:

This very basic plan is the least comprehensive plan we offer. There is no charge for 60 [cents]/lb. per article, but you must specifically request it in writing on the Bill of Lading. Under this valuation, Mayflower Transit's maximum liability for an item lost or damaged weighing 70 pounds would be $42 (70 lbs. times 60 [cents] = $42.00). Depreciation is also considered by Mayflower Transit when determining settlement amounts. This plan is used most frequently by corporations that have blanket coverage for their employees. Affidavit of John Parcher, Exhibit D.

**1506**

Defendants' position that fraud claims are preempted by the Carmack Amendment.

 With respect to conversion, Plaintiff must show a true conversion has taken place in order to avoid Carmack Amendment preemption; the mere nondelivery of goods is insufficient. *Glickfeld v. Howard Van Lines, Inc.*, 213 F.2d 723 (9th Cir.1954); *Art Masters Assoc., Ltd. v. United Parcel Service*, 77 N.Y.2d 200, 566 N.Y.S.2d 184, 567 N.E.2d 226 (Ct.App.1990).

In *Art Masters*, the New York court addressed the conversion issue and stated:

> Federal courts routinely require that in the presentation of claims for damages for the nondelivery of goods, in order to avoid application of agreed-upon limitation of liability, a claimant must establish a true conversion—a defendant's willful or intentional misconduct occasioning the nondelivery; where no such proof is forthcoming, the agreed-upon limitation of liability is enforced. (see *Lerakoli, Inc. v. Pan Am. World Airways*, 783 F.2d 33, 37–38, *cert. denied*, 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 54; *Nippon Fire & Mar. Ins. Co. v. Holmes Transp.*, 616 F.Supp. 610, 611–612; *see also Vogelsang v. Delta Air Lines*, 302 F.2d 709, 712, *cert. denied*, 371 U.S. 826, 83 S.Ct. 46, 9 L.Ed.2d 65).

*Art Masters Assoc., Ltd. v. United Parcel Service*, 566 N.Y.S.2d at 186, 567 N.E.2d at 228.

The Ninth Circuit cited *Art Masters* in *Glickfeld*, and addressed the issue of conversion during a movement of goods in interstate commerce:

> [T]he cases are uniform in holding that the conversion doctrine is pertinent only when there has been a true conversion, *i.e.*, where the carrier has appropriated the property for its own use or gain. The carrier may properly limit its liability where the conversion is by third parties or even by its own employee. In the latter circumstance, while the carrier may have been guilty of negligence in the selection of its employees, it has not been unjustly enriched, nor has it been guilty of any misconduct.

*Glickfeld v. Howard Van Lines, Inc.*, 213 F.2d at 727. *See also, Hughes v. United Van Lines, Inc.*, 829 F.2d 1407 (7th Cir.1987).

Plaintiff has asserted nondelivery of goods but has offered no evidence that Mayflower, Peeters or Auld committed true conversion. Nor is there any evidence that Mayflower, Peeters or Auld have been unjustly enriched. Absent such a showing, the limitations of liability as provided in the Bill of Lading should control and Plaintiff's damages should be limited to $.60 per pound, per article.

### Order

Based on the foregoing, the Court having carefully considered these matters and being fully advised in the premises;

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss (Dkt. # 38) be, and is, GRANTED in its entirety.