**QWEST BROADBAND SERVICES, INC, a Delaware corporation, Plaintiff,**

v.

**CITY OF BOULDER, Colorado, Defendant.**

No. CIV. A. 00–B–542.

United States District Court, D. Colorado.

July 19, 2001.

David H. Stacy, Davis, Graham & Stubbs LLP, United States District Court, Denver, CO, John Brian DeBoice, Cohn & Marks, Washington, DC, for plaintiff.

Alan Edgar Boles, Jr., Joseph Napoleon De Raismes, City Attorney's Office, Boulder, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiff Qwest Broadband Services, Inc. ("Qwest") brings this declaratory judgment suit against Defendant City of Boulder, Colorado ("City" or "Boulder"). Qwest moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Boulder moves for partial summary judgment. The motions are adequately briefed and oral argument would not materially aid their resolution. For the reasons set forth below, I grant Qwest's motion for judgment on the pleadings and deny Boulder's motion for partial summary judgment.

### I. Facts

The parties have entered into a stipulated agreement regarding the facts in this case. Qwest Broadband Services is a wholly owned subsidiary of Qwest Communications International, Inc. incorporated under the laws of Delaware and with its principal place of business in Colorado. Qwest currently provides cable television programming in Boulder through a revocable permit granted by Boulder. Boulder also has two other cable television operators, TCI Communications, Inc. ("TCI") and Wild Open West Colorado, LLC. ("WOWC"). TCI operates through a revocable permit granted by Boulder, while WOWC operates through a twelve-year franchise.

Because the permit under which Qwest currently operates allows the City to cancel at any time and for any reason, Qwest seeks a franchise allowing it to provide long-term cable television services within the City. A provision in Boulder's Charter requires that voters in a municipal election approve any franchise before it is granted by the City. Wishing to avoid the expense of such an election, Qwest brings this suit, arguing that the election provision is preempted by certain provisions of federal law, set out in Part III, *infra.*

### II. Standards for the Motions

Qwest moves for judgement pursuant to Fed.R.Civ.P. 12(c), while Boulder moves pursuant to Fed.R.Civ.P. 56. I first consider the applicable standards for each motion.

### A. Motion for Judgment on the Pleadings

Fed.R.Civ.P. 12(c) provides that,

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Here, Qwest attaches matters outside the pleadings as exhibits. I therefore consider the parties' motions as cross-motions for summary judgment.

### B. Motion for Summary Judgment

The purpose of a summary judgment motion is to assess whether trial is necessary. *See White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *See Celotex,* 477

U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. Rule 56(e); *see also Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980). These facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Where, as here, the parties file cross motions for summary judgment, I assume no evidence need be considered other than that filed by the parties.

### III. Cross–Motions for Summary Judgment

Qwest moves for a declaratory judgment, arguing that the franchise provision in the Boulder charter is preempted by federal law. The Charter states, "No franchise shall be granted by the city except upon the vote of the qualified taxpaying electors ...." City Charter at Article VIII § 108 (attached to Complaint). The parties agree that this section applies to cable television franchises. *See also Community Tele–Communications, Inc. v. Heather Corp.,* 677 P.2d 330 (Colo.1984).

Qwest argues that § 108 is preempted by section 621(a)(1) of Title VI of the Communications Act of 1934 as amended. That statute states in pertinent part:

A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; *except that a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise.* Any applicant whose application for a second franchise has been denied by a final decision of

the franchising authority may appeal such final decision pursuant to the provisions of section 555 of this title for failure to comply with this subsection.

47 U.S.C. § 541(a)(1) (emphasis added).

### A. Federal Preemption Doctrine

The doctrine of preemption originates in the Supremacy Clause of the United States Constitution. That clause states:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ..., shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST., art. VI, cl. 2. *See also Gibbons v. Ogden,* 9 Wheat. 1, 22 U.S. 1, 211, 6 L.Ed. 23 (1824) ("In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."). State law that conflicts with federal law is without effect. *See M'Culloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819).

Preemption is fundamentally a question of congressional intent. A court must presume that "the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Congressional intent to monopolize an area is expressed in the authorizing statute and in the regulations enacted pursuant to that statute. *See Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

[2] A statute or regulation may be construed as being preemptive under three circumstances. *See Cipollone*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407. First, Congress's intent to preempt state law may be explicitly stated in the statute. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Second, in the absence of express statutory language, preemption may be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice*, 331 U.S. at 230, 67 S.Ct. 1146; *see also Hillsborough County*, 471 U.S. at 713, 105 S.Ct. 2371. Implied preemption also occurs when " 'the Act of Congress ... touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Fidelity Fed. Sav. and Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. 1146). Third, preemption exists when state law conflicts with federal law. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

[3] The parties agree that preemption occurs here, if at all, due to conflict preemption. Conflict preemption is implicated when it is impossible for a private party to simultaneously comply with both state and federal laws, *see Ray*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179; *Florida Lime and Avocado Growers*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248, or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Hines*, 312 U.S. at 67–68, 61 S.Ct. 399. *See also Keith v. Rizzuto*, 212 F.3d 1190, 1193 (10th Cir.2000) (quoting *Southwestern Bell Wireless Inc. v. Johnson County Bd. of County Comm'rs*, 199 F.3d 1185, 1189–90 (10th Cir.1999)). "Conflict preemption requires that the state or local action be a material impediment to the federal action, or thwart[ ] the federal policy in a material way." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir.1998) (internal quotations and citations omitted).

Congress has made its intent regarding the preemptive effect of Title VI clear. 47 U.S.C. § 556 states, "Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, *to the extent consistent* with the express provisions of this subchapter." *Id.* at § 556(a) (emphasis added). Additionally, "Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services *consistent with this subchapter*." *Id.* at § 556(b) (emphasis added). However, "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded." *Id.* at § 556(c).

**B. Title VI of the Communications Act of 1934**

[4] Both parties ably set out the history of Title VI of the Communications Act, which I briefly summarize here. The section of the Communications Act in question came about as a result of three different amendments to the Communications Act of 1934.

Prior to 1984, both the Federal Communications Commission ("F.C.C.") and local governments asserted regulatory authority over cable television. However, the breadth of their respective powers was ill-defined. Responding to this regulatory uncertainty, Congress enacted the Cable Communications Policy Act of 1984, which added Title VI provisions governing cable operators. *See* 47 U.S.C. §§ 521–522, 531–533, 541–547, 551–559 (Supp. III 1985). Congress passed the Cable Act in large measure to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems." 47 U.S.C. § 521(3). In establishing regulatory guidelines, Congress was concerned both with relieving the cable industry from unnecessary, burdensome regulation, and with ensuring that cable systems remained responsive to the needs of the public. *See* 47 U.S.C. §§ 521(2), (4), (6); *American Civil Liberties Union v. Federal Communications Comm'n*, 823 F.2d 1554 (D.C.Cir.1987).

In the 1984 Act, Congress recognized the role that municipalities historically played in regulating cable services. Traditionally, one of the justifications for local regulation of cable television was the fact that cable companies must tear up city streets or string cable along utility poles in order to provide cable service. In granting this right to public resources, municipalities have imposed various responsibilities on the beneficiaries of their largesse. *See, e.g., Community Communications Co. v. City of Boulder, Colo.*, 660 F.2d 1370, 1377–78 (10th Cir.1981), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). The existence of physical and economic limitations on the number of cable systems that can be constructed and operated in a single community has also been cited as a justification for local regulation. *See id.* at 1378–79; *but see Quincy Cable TV, Inc. v. Federal Communications Comm'n*, 768 F.2d 1434, 1449–50 (D.C.Cir.

1985) (discounting both of these rationales). To preserve the role of municipalities in cable regulation, Title VI provided that, with limited exceptions, "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1); *City of Dallas, Tex. v. Federal Communications Comm'n*, 165 F.3d 341 (5th Cir. 1999).

Second, in 1992 Congress made additions to the Act through the Cable Television Consumer Protection and Competition Act of 1992. Among other things, the 1992 Act subjects the cable industry to rate regulation by the F.C.C. and by municipal franchising authorities; prohibits municipalities from awarding exclusive franchises to cable operators; imposes various restrictions on cable programmers that are affiliated with cable operators; and directs the F.C.C. to develop and promulgate regulations imposing minimum technical standards for cable operators. *See Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 630, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

Finally, Congress passed The Telecommunications Act of 1996 in an effort to further encourage local competition. *See* Jim Chen, *The Magnificent Seven: American Telephony's Deregulatory Shootout*, 50 Hastings L.J. 1503, 1514 (1999). "The Act sought to unleash three of the most deeply entrenched monopolists in the American economy—local exchange carriers, interexchange carriers, and cable system operators—on each other's markets in the hope that competition among the large would dissolve these industrial giants." *Id.*

## C. Direct Conflicts

The first issue I must address is whether § 108 conflicts directly with 47 U.S.C. § 541 as defined by the conflict preemption doctrine. In order for a direct conflict

to occur, it must be impossible for Qwest to simultaneously comply with both state and federal law. *See Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Qwest argues that direct conflict exists between § 108 and the franchising, judicial review, modification, and renewal provisions outlined in the federal statute.

### 1. Franchising Provisions

Qwest argues that the language in 47 U.S.C. § 541 regulating franchising authorities is in direct conflict with § 108's mandatory election provision. I agree.

First, the Act provides guidance to, and restrictions on, "franchising authorities." Section 541's requirements are directed toward franchising authorities. *See* 47 U.S.C. § 541(a)(1), (3), (4). Under the statute, a "franchise" is "an initial authorization, or renewal thereof," issued by a franchising authority to construct or operate a cable system. 47 U.S.C. § 522(9). A " 'franchising authority' means any *governmental entity* empowered by Federal, State, or local law to grant a franchise." 47 U.S.C. § 522(10) (emphasis added).

Here, Qwest approached City officials to seek franchise approval. The City granted a revokable permit to Qwest, and agreed to "grant a cable television franchise authorizing [Qwest] to provide cable television service within the City for a term of years" once an affirmative vote by the qualified taxpaying voters occurred. *See* Complaint at ¶ 14. There is no evidence that the City negotiated the franchise in any manner, or put any additional restrictions or caveats on the franchise beyond voter approval. City officials follow the will of the voters with no additional scrutiny or decision-making. Thus, the City has abdicated franchising authority to the City's voting citizens. These voters can-

not, by the plain terms of the statute, be a "governmental entity empowered by Federal, State, or local law to grant a franchise." 47 U.S.C. § 522(10). Therefore, direct conflict between the federal and local laws exist, as it is impossible for the franchise to be granted by a governmental entity as required by the Act, and simultaneously granted by the voters as required in § 108.

Second, § 541 imposes numerous and specific requirements on franchising authorities. The statute forbids exclusive franchises, *see* § 541(a)(1); unreasonable refusals to award additional competitive franchises, *see id.* at (a)(1); requirements that have the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator, *see id.* at (b)(3)(B); ordering a cable operator or affiliate thereof to discontinue the provision of a telecommunications service, discontinuing the operation of a cable system by reason of the failure of a cable operator to obtain a franchise or franchise renewal, *see id.* at (b)(3)(C)(i)-(ii); or requiring a cable operator to provide any telecommunications service or facilities as a condition of the initial grant of a franchise. *See Id.* at (b)(3)(D).

A franchising authority has affirmative requirements as well. It must assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides, *see id.* at (a)(3); and allow the applicant's cable system a reasonable period of time to become capable of providing cable service to all households in the franchise area, *see id.* at (a)(4)(A).

However, by allowing voters unfettered and unreviewed discretion to grant or reject a franchise, § 108 is in conflict with virtually every provision in § 541. Be-

cause only WOWC has received a franchise, voters could effectively grant WOWC an exclusive franchise simply by refusing to vote affirmatively for a second operator. *See id.* at (a)(1). Voters could unreasonably refuse to award an additional competitive franchise, as they could deny a franchise for any reason or for no reason. *See id.* Qwest correctly argues that § 108 "provides voters with the unfettered and unreviewable discretion either to grant or deny a cable television franchise for any reason, or for no reason at all." Qwest's Motion for Judgment on the Pleadings at 3. While voters could not directly impose any requirement that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator, they could make clear through campaigns, public debates, and votes at the ballot box that no franchise will be granted unless such requirements are met. *See id.* at (b)(3)(B). In the same way, voters could require a cable operator to provide any telecommunications service or facilities as a condition of the initial grant of a franchise. *See id.* at (b)(3)(D). Further, voters are unlikely to assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides, or to allow the applicant's cable system a reasonable period of time to become capable of providing cable service to all households in the franchise area. *See id.* at (a)(3)-(4). Thus, § 108 is in direct conflict with the provisions of § 541, and is thus preempted by the federal statute. *See also Cellular Phone Taskforce v. F.C.C.,* 205 F.3d 82 (2d Cir.2000) ("We have no doubt that Congress may preempt state and local governments from regulating the operation and construction of a national telecommunications infrastructure, including construction and operation of personal wireless communications facilities.") (citing *City of New York v. F.C.C.,* 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. at 698–700, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).); *Southwestern Bell Wireless Inc. v. Johnson County Bd. of County Comm'rs,* 199 F.3d 1185 (10th Cir. 1999) (Telecommunications Act of 1996 preempted a county zoning regulation involving radio frequency interference through field preemption).

## 2. Additional Provisions

Because I have found that § 108's election provision is in direct conflict with § 541, it is unnecessary for me to address the additional provisions of the Communications Act cited by Qwest.

## D. Conflict with Congressional Purposes

■ Even if I were to find, however, that no direct conflict exists between § 108 and § 541, § 108 is preempted by § 541 because § 108 conflicts with the clear congressional purpose of the Communications Act. Conflict preemption may occur not only when a direct conflict exists, but also when a state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67–68, 61 S.Ct. 399, 85 L.Ed. 581 (1941). I agree with Qwest that § 108 is such an obstacle.

In the 1980's, cable providers were generally granted exclusive franchises, resulting in monopolies. *See* Michael D. Blanchard, Note, *Regulated Industries— Statutory Construction of Section 541(a) of the Cable Television Consumer Protection and Competition Act of 1992: A Presumption in Favor of Practical Reason,* 18 W. NEW ENG.L. REV. 437 (1996). As a result, Congress passed the Cable Television Consumer Protection and Competi-

tion Act of 1992, of which § 541 was a part.

The name of the Act itself indicates Congressional intent. The 1992 Act "was intended to 'ensure that cable television operators do not have undue market power.' ... Congress attempted to effectuate this policy through the promotion of managed competition. Section 541(a) ... was one of the mechanisms created to promote managed competition." *Id.* at 447 (citations omitted). Other provisions in the Act aimed to increase competition as well. *See id.;* 47 U.S.C. § 541(f); James W. Olson & Lawrence J. Spiwak, *Can Short–Term Limits On Strategic Vertical Restraints Improve Long–Term Cable Industry Market Performance?*, 13 CARDOZO ARTS & ENT. L.J. 283, 305 (1995). (In passing the legislation, Congress believed that the key to improving the cable industry was to "focus on ensuring competitive dealings between programmers and cable operators and between programmers and competing video distributors."). The 1992 Act affirms the jurisdiction of state and local franchising authorities to regulate cable rates, although cable systems subject to "effective competition," are exempt from rate regulation. *See* Erik Forde Ugland, *Cable Television, New Technologies and the First Amendment After Turner Broadcasting System, Inc. v. F.C.C.*, 60 MO. L. REV. 799, 811–12 & n. 92 (1995). Additionally, franchising authorities are prohibited from granting exclusive franchises and from unreasonably refusing to award an additional franchise, 47 U.S.C. § 541(a)(1), franchise authorities are permitted to refuse to grant franchises to cable system operators who already operate a franchise in the same area, *id.*, and municipalities are permitted to own cable television systems and those that do are exempt from any rate regulation. *Id.*

The legislative history clearly supports the proposition that Congress was focused on fostering competition when passing the 1992 Act. The Senate Report regarding the Act states, "[I]t is clear that there are benefits from competition between two cable systems. Thus, the Committee believes that local franchising authorities should be encouraged to award second franchises." S.Rep. No. 92, 102d Cong., 1st Sess. 14 (1991) (referring to the unreasonable denial provisions in § 541). Similarly, the House Report stated,

> The Committee continues to believe that competition is essential both for enduring diversity in programming and for protecting consumers from potential abuses by cable operators possessing market power. However, for a number of reasons, such competition has not emerged on a widespread basis. The Committee believes that steps must be taken to encourage the further development of robust competition in the video programming marketplace ...

H.R.Rep. No. 628, 102d Cong, 2d Sess. 44–47 (1992) (referring to the anti-exclusivity and unreasonable denial provisions in § 541). *See also* H.R. Conf. Rep. No. 862, 102d Cong, 2d Sess. 77 (1992), U.S.Code Cong. & Admin.News 1992, pp. 1231, 1259 (the 1992 Act "is intended to promote the development of competition . . . .").

Given the clear intent of Congress to employ § 541 as a vehicle for promoting vigorous competition, I conclude that § 108 is in conflict. Section 108 serves only to provide a significant hindrance to the competition that Congress clearly intended to foster. It forces the potential franchiser to spend money, time, advertising, and logistical support on an election. Thus, § 108 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S.Ct. 399, 85 L.Ed. 581 (1941), and is preempted by the federal law.

### E. Tenth Amendment

█ The City of Boulder argues, however, that if I conclude that preemption has occurred, then I must conclude that § 541 violates the Tenth Amendment to the United States Constitution. I disagree.

The Tenth Amendment provides that, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States,* 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). If the authority to act has been delegated by the Constitution to Congress, then it may act pursuant to Article I; if not, the power has been reserved to the states by the Tenth Amendment. *See id.* Thus, the inquiries under the Commerce Clause and the Tenth Amendment are mirror images, and a holding that a Congressional enactment does not violate the Commerce Clause is dispositive of a Tenth Amendment challenge. *See United States v. Baer,* 235 F.3d 561, 563 n. 6 (10th Cir.2000). The Tenth Amendment applies to the political subdivisions of the States as well as states themselves. *See Printz v. United States,* 521 U.S. 898, 931 n. 15, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

The Tenth Circuit has held that Congress can regulate communications pursuant to the Commerce Clause. *See Southwestern Bell Wireless Inc. v. Johnson County Bd. of County Comm'rs,* 199 F.3d 1185 (10th Cir.1999) (citing *Federal Communications Comm'n v. League of Women Voters of Cal.;* 468 U.S. 364, 375, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)). It has also held that the Telecommunications Act of 1996 does not violate the Tenth Amendment. *See id.* Thus, to successfully demonstrate a violation of the Tenth Amendment Boulder must not only distinguish these cases, but must also show that: (1) the challenged statute or regulation regulates "states as states;" (2) it addresses matters that are indisputably attributes of state sovereignty; and (3) compliance with it would directly impair the State's ability to structure integral operations in areas of traditional state functions. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 287–88, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *United States v. Hampshire,* 95 F.3d 999, 1004 (10th Cir.1996), *cert. denied,* 519 U.S. 1084, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997).

Boulder has not met its burden under this test. Boulder does not distinguish either *Southwestern Bell Wireless* or *League of Women Voters.* Further, it has failed to show that § 541 regulates "states as states," addresses matters that are indisputably attributes of state sovereignty, or requires compliance that would directly impair its ability to structure integral operations in areas of traditional state functions. Rather, it argues the importance of the election requirement to the public. It argues that to uphold Qwest's preemption claim is to compel Boulder voters to "grant the City of Boulder the right to enter into contracts; and indeed ... compel[ ] the City to contract and bind the citizens without their approval." Brief in Support of the City of Boulder's Motion for Partial Summary Judgment at 25. However, Boulder contracts and binds its citizens in myriad ways. It has simply chosen to allow citizens a voice in franchising decisions. Such a decision does not render all congressional legislation on the same topic a violation of the Tenth Amendment.

Boulder has therefore failed to meet its burden under the Tenth Amendment.

Accordingly, IT IS ORDERED that:

(1) Plaintiff's motion for judgment on the pleadings is GRANTED;

(2) Defendant's motion for partial summary judgment is DENIED; and

(3) A declaratory judgment shall enter declaring that Section 108 of the City of Boulder is preempted by 47 U.S.C. § 541; and

(4) Plaintiff is awarded its costs.