**PEOPLE OF THE STATE OF NEW YORK & PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Respondent,**

MCI WorldCom, Inc., Bell Atlantic, Airtouch Paging, U.S. West, Inc., New York State Consumer Protection Board, AT & T Corporation, The City of New York, Missouri Public Service Commission & Consumer Federation of America, Intervenors.

Docket No. 99–4205.

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 2001.

Decided Sept. 28, 2001.

Carl F. Patka, Assistant Counsel to the Public Service Commission of the State of New York, Albany, N.Y. (Lawrence G. Malone, General Counsel to the Public Service Commission of the State of New York, of counsel), for Petitioner.

Pamela L. Smith, Federal Communications Commission, Washington, DC, (Christopher J. Wright, General Counsel, John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Washington, DC, Joel I. Klein, Assistant Attorney General, Catherine G. O'Sullivan, Nancy C. Garrison, United States Department of Justice, Washington, DC, of counsel), for Respondent.

James F. Warden, Jr., New York State Consumer Protection Board, Albany, NY, for Intervenor New York State Consumer Protection Board.

James H. Bolin, Jr., AT & T Corporation, Basking Ridge, NJ, (Mark C. Rosenblum, Roy E. Hoffinger, AT & T Corporation, Basking Ridge, NJ, David W. Carpenter, Peter D. Keisler, James P. Young, Sidley & Austin, Washington, DC, of counsel), for Intervenors AT & T Corporation, MCI WorldCom, Inc., and U.S. West, Inc.

Edward F.X. Hart, of counsel to the Corporation Counsel of the City of New York, New York, NY, (Michael D. Hess, Corporation Counsel of the City of New York, Leonard Koerner, Bruce Regal, of counsel), for Intervenor City of New York.

Mark N. Cooper, Ph.D., pro se, Consumer Federation of America, Silver Springs, MD, for Intervenor Consumer Federation of America.

William D. Smith, Bell Atlantic, New York, NY, for Intervenor Bell Atlantic.

Carl W. Northrop, Paul, Hastings, Janofsky & Walker, Washington, DC, for Intervenor Airtouch Paging.

Philip V. Permut, Kelley Drye & Warren, Washington, DC, for Intervenor Paging Network, Inc.

Before: PARKER, SACK, and KATZMANN, Circuit Judges.

PARKER, Circuit Judge:

While we hail improvements in technology, we often mourn the resulting loss of simplicity in our lives. So too with the increase in communications options. Because of the addition of fax machines, modems, cellular telephones and pagers to the traditional landline telephone, we are forced to overcome an ongoing shortage of telephone numbers. This shortage has necessitated the addition of area codes to many populous areas, including New York City, an addition causing anxiety for many.[1]

In the controversy before us, New York State and the New York Public Service Commission (collectively, the "NYPSC" or "New York") challenge the authority of the Federal Communications Commission ("FCC" or "the Commission") to promulgate a rule, 47 C.F.R. § 52.19 (2000), delegating to States the authority to choose which type of area code relief to implement, and requiring mandatory ten-digit dialing for all local calls in areas implementing overlay area code relief, promulgated in *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 11 F.C.C.R. 19,392, 1996 WL 819798 (August 8, 1996) (*"Second Order"*). Additionally, the NYPSC challenges the FCC's refusal to grant a waiver from this rule for New York City. *See Implementation of the Local Competition Provisions of the Telecomm. Act of 1996*, 18 Communications Reg. (P & F) 333, 1999 WL 961570 (October 21, 1999) (*"Third Order"*) (denying New York's renewed petition for expedited waiver of 47 C.F.R. § 52.19(c)(3)(ii)). Because we conclude that the FCC was within its power to promulgate the challenged rule, and that the FCC acted within its discretion in denying the waiver for New York City, we affirm the FCC's decisions and deny the NYPSC's petition.[2]

---

1. Indeed, the apprehension about the addition of new area codes (and the concomitant addition of numbers required to dial a local call) has reached such levels that the controversy has found its way into popular culture. In a November 2000 episode of the television series, "The Simpsons," Springfield, the local town, "was riven culturally and politically by the introduction of a second area code. Homer Simpson became mayor of New Springfield on a campaign promise to build a wall between the two towns." Simon Romero, *Now You Need an Area Code Just to Call Your Neighbors*, N.Y. Times, May 7, 2001, at A1 ("Romero, *Now You Need An Area Code* "); *see also Seinfeld: The Maid* (NBC television broadcast, Apr. 30, 1998) (depicting the character Elaine receiving a "646" phone number and experiencing social ostracization as a result).

2. There are several intervenors in this action. Intervening and filing briefs in support of the NYPSC's petition for review are the New York State Consumer Protection Board ("CPB"), the City of New York ("NYC"), and Consumer Federation of America ("CFA"). Intervening and filing a brief in support of the FCC's position are AT & T Corp., MCI Worldcom, Inc., and U.S. West, Inc. (collectively, "the industry intervenors").

Several intervenors entered appearances but failed to file briefs. These intervenors are Airtouch Paging, Bell Atlantic, Paging Network, Inc., and the Missouri Public Service Commission.

## I.  BACKGROUND

### A.  *The North American Numbering Plan*

The North American Numbering Plan ("NANP") is the basic numbering scheme that permits telecommunications service within the United States and its territories, Canada, Bermuda and many Caribbean nations. *See* 47 C.F.R. § 52.5(c); *see also Admin. of the N. Am. Numbering Plan,* 11 F.C.C.R. 2588, ¶ 3, 1995 WL 418759 (July 13, 1995) ("*NANP R & O*"). Under the NANP, telephone numbers are ten digits in length: the first three digits are called the numbering plan area ("NPA" or "area") code, the second three are called the central office code, or prefix, and the final four digits are the individual line numbers. *See id.* ¶¶ 8–9. The NANP was developed by AT & T and Bell Laboratories in the 1940s in order to standardize telephone dialing and to ensure the development of an integrated nationwide telephone network. *See id.,* ¶ 8. The result was the current system of dialing seven digits within an area and three-digit area codes. At the time of the NANP's development, the number of digits required to place a call varied with the size of the community. To ease the transition to seven-digit local numbers, the central office codes (the first three digits of a local call) were the first three letters of a word followed by the individual line number. As the numbers were quickly exhausted using this method, this system was replaced by the "2–5 system" which employed two letters and five numbers—e.g., "Pennsylvania 6–5000." Eventually, this system too had to be replaced, this time by an "all-number" seven-digit dialing system for local calls. As with the current ten-digit dialing controversy, seven-digit dialing, imposed in the early 1960's, met with opposition, and groups such as the "Anti–Digit Dialing League" and the "Committee of Ten Million to Oppose All–Number Calling" sprouted. *See* Romero, *Now You Need an Area Code.*

For over 40 years, AT & T administered this plan (the NANP), but ceased its administration in 1984 at divestiture. *See NANP R & O,* ¶ 10. Currently, the NANP is administered by NeuStar, Inc., a private company based in Washington. *See* Romero, *Now You Need an Area Code.*

### B.  *Area Code Relief*

Area code relief is the process by which central office codes are made available when there are few or no unassigned central office codes remaining in an existing area code and, often, a new area code is introduced. *See Third Order,* ¶ 5 n. 32. A new area code is assigned when almost all of the central office codes within an area code are consumed.

There are three methods to implement area code relief. *See* 47 C.F.R. § 52.19 (2000). The first, a geographic area code split, occurs when there is a central office code shortage in one area and that area is then split into two or more geographic parts. *See id.* § 52.19(c)(1). The second, a boundary realignment, "occurs when the boundary lines between two adjacent area codes are shifted to allow the transfer of some central office codes from an area code for which central office codes remain unassigned to an area code for which few or no central office codes are left for assignment." *Id.* § 52.19(c)(2). The third method, an area code overlay, "occurs when a new area code is introduced to serve the same geographic area as an existing area code." *Id.* § 52.19(c)(3). The NYPSC's choice to implement the third method, an area code overlay, for the City of New York, has sparked the current controversy.

### C. The Telecommunications Act of 1996

In 1996, Congress enacted the Telecommunications Act of 1996, ("the Act" or "the 1996 Act"), which amended the Communications Act of 1934, 47 U.S.C. § 151 et seq. See Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56 (1996). The 1996 Act is "an [a]ct to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Id. The Act "fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent [local exchange carriers or "LECs"] are subject to a host of duties intended to facilitate market entry." AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). "Most important, Congress ended the States' longstanding practice of granting and maintaining local exchange monopolies." Id. at 405, 119 S.Ct. 721 (Thomas, J., concurring in part, dissenting in part); see also 47 U.S.C. § 253(a) (2001). To achieve the goal of opening the local telephone markets to competition, Congress enacted section 251 of the Act, entitled "Interconnection," which imposes several obligations on incumbent LECs to allow access to their networks by competitors. 47 U.S.C. § 251 (2001). This section includes a provision entitled "Numbering Administration," which is the subject of this appeal. This subsection provides, in relevant part:

> The Commission shall create or designate one or more impartial entities to administer telecommunications number-ing and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

47 U.S.C. § 251(e)(1) (2001).

### D. The FCC's Orders and Actions Taken by New York

In August 1996, the FCC promulgated rules to implement the provisions of § 251, including § 251(e). See Implementation of the Local Competition Provisions of the Telecomm. Act of 1996, 11 F.C.C.R. 19,392, 1996 WL 819798 (August 8, 1996) ("Second Order").[3] The FCC, under § 251(e)(1), delegated to the states a portion of its "exclusive jurisdiction" over the NANP, and "authorize[d] the states to resolve matters involving the implementation of new area codes." Id. ¶ 272. The FCC reasoned that "[s]tate commissions are uniquely positioned to understand local conditions and what effect new area codes will have on those conditions." Id. The FCC prohibited any service-specific or technology-specific overlay area codes, but refused to, as some parties suggested, prohibit overlay area codes altogether. See id. ¶ 281–82. Additionally, the FCC repeated its previously-established policy objectives that "numbering administration should: (1) seek to facilitate entry into the communications marketplace by making numbering resources available on an efficient and timely basis; (2) not unduly favor or disadvantage any particular industry segment or group of consumers; and

---

**3.** Some of these rules, which are not at issue here, were the subject of a prior petition for review, which was ultimately decided by the United States Supreme Court in AT & T Cor-poration v. Iowa Utilities Board, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). This case is discussed infra.

(3) not unduly favor one technology over another." *Id.* ¶ 281.

The FCC noted the benefits of adopting area code overlays as a method of implementing area code relief. *See id.* ¶ 283. One such benefit includes ease of implementation because overlays do not require existing customers to change their telephone numbers. *See id.* Additionally, the FCC observed that overlays avoid the absurd result that sometimes occur with geographic splits, that an area code would not even cover a single neighborhood in some metropolitan areas. *See id.* The FCC, believing that State commissions were best suited to determine what type of relief would be desirable given "local circumstances," delegated to them the task of determining which method to implement. *Id.*

However, the FCC also imposed two conditions on the use of overlay area codes. *See id.* ¶ 286. The FCC required overlay plans to include "availability to every existing telecommunications carrier ... authorized to provide telephone exchange service, exchange access, or paging service in the affected area code 90 days before the introduction of a new overlay area code, of at least one NXX [central office code] in the existing area code, to be assigned during the 90–day period preceding the introduction of the overlay." *Id.;* *accord* 47 C.F.R. § 52.19(c)(3)(i) (2000). This requirement serves to reduce the potentially anti-competitive effect of area code overlays by "reduc[ing] the problems competitors face in giving their customers numbers drawn from only the new 'undesirable' area codes while the incumbent carriers continue to assign numbers in the 'desirable' old area codes to their own customers." *Second Order,* ¶ 288.

Also, most important to this petition for review, the FCC ruled that it would permit "all-services overlay plans only when" these plans include "mandatory 10–digit local dialing by all customers between and within area codes in the area covered by the new code." *Id.* ¶ 286; *see also* 47 C.F.R. 52.19(c)(3)(ii) (2001). Regarding this condition, the FCC reasoned that 10–digit dialing would

> ensure that competition will not be deterred in overlay area codes as a result of dialing disparity. Local dialing disparity would occur absent mandatory 10–digit dialing, because all existing telephone users would remain in the old area code and dial 7–digits to call others with numbers in that area code, while new users with the overlay code would have to dial 10–digits to reach any customers in the old code. When a new overlay code is first assigned, there could be nearly 8 million numbers assigned in the old code, with just a few thousand customers using the new overlay code. If most telephone calls would be to customers in the original area code, but only those in the new code must dial ten-digits, there would exist a dialing disparity, which would increase customer confusion. Customers would find it less attractive to switch carriers because competing exchange service providers, most of which will be new entrants to the market, would have to assign their customers numbers in the new overlay area code, which would require those customers to dial 10–digits much more often than the incumbent's customers, and would require people calling the competing exchange service provider's customer to dial 10–digits when they would only have to dial 7–digits for most of their other calls. Requiring 10–digit dialing for all local calls avoids the potentially anti-competitive effect of all-services area code overlays.

*Second Order,* ¶ 287. The FCC also noted that incumbent LECs have an advantage

over new entrants in that they can "warehouse" central office codes in the old area code, and also get old area code numbers returned to them when customers move or cease service. *Id.* ¶ 289.

While the FCC delegated to the State commissions authority to determine area code relief methods, and also to "perform functions associated with initiating and planning area code relief, as distinct from adopting final area code relief plans," *id.* ¶ 318, it declined to delegate the task of overall number allocation, *id.* ¶ 320–21. The FCC reasoned that a "nationwide, uniform system of numbering ... is essential to efficient delivery of telecommunications services in the United States." *Id.* ¶ 320.

Additionally, the FCC explicitly recognized the role of the State commissions prior to the 1996 Act: "We conclude that the states *may continue to* implement or change local dialing patterns subject to any future decisions by the Commission regarding whether to require uniform nationwide dialing patterns." *Id.* ¶ 315 (emphasis added). Prior to the rule's promulgation, states were responsible for determining the number of digits to be dialed for intra-area code toll calls and for inter-area code local calls. *See id.* ¶ 316. The FCC reasoned that this power was best left to the states "subject to ... the Commission's requirement in this Order of 10–digit dialing for all calls within and between NPAs in any area where an area code overlay has been implemented" because "States are in the best position at this time to determine dialing patterns because of their familiarity with local circumstances and customs regarding telephone usage." *Id.* ¶ 317.

Therefore, the FCC promulgated the following rule regarding area code relief:

(a) State commissions may resolve matters involving the introduction of new area codes within their states. Such matters may include, but are not limited to: Directing whether area code relief will take the form of a geographic split, an overlay area code, or a boundary realignment; establishing new area code boundaries; establishing necessary dates for the implementation of area code relief plans; and directing public education efforts regarding area code changes....

(c) New area codes may be introduced through the use of: ... (3)[a]n area code overlay, which occurs when a new area code is introduced to serve the same geographic area as an existing area code, subject to the following conditions: ... (ii) No area code overlay may be implemented unless there exists, at the time of implementation, mandatory ten-digit dialing for every telephone call within and between all area codes in the geographic area covered by the overlay area code.

47 C.F.R. § 52.19 (2000).

New York filed a petition for reconsideration of the mandatory 10–digit local dialing rule on October 7, 1996, arguing that the FCC lacked authority to promulgate the 10–digit dialing rule and that the imposition of this rule would impose extreme costs to consumers and to the telephone networks.

While the petition for reconsideration was pending, the NYPSC, on December 10, 1997, issued an order concluding it would implement an overlay area code to relieve the impending central office code shortages within the 212, 917, and 718 area codes of New York City. Although the NYPSC recognized possible problems with the FCC's 10–digit dialing requirement, the NYPSC determined that an overlay was preferable to a geographic split. To obviate competitive concerns, the NYPSC mandated local number portability, which would allow customers changing telephone

service providers to keep their area code and phone number, and number pooling, which assigns telephone numbers in small blocks to both incumbent LECs and competitive LECs.

On January 9, 1998, following its decision to implement overlay area codes and faced with the FCC's inaction on the earlier reconsideration petition, New York filed a Supplemental Petition for Reconsideration. In the supplemental petition, the NYPSC argued that 10–digit dialing was not necessary to promote competition in New York City and, again, that the FCC lacked jurisdiction to impose the 10–digit dialing requirement.

On that same day, the NYPSC petitioned for an expedited waiver of 47 C.F.R. § 52.19(c)(3)(ii). The waiver petition pressed arguments similar to the earlier petitions, outlined the inconveniences imposed by the 10–digit dialing requirement, and urged that the requirement was unnecessary to promote competition in New York. On July 20, 1998, the FCC's Common Carrier Bureau denied a permanent waiver of the 10–digit dialing rule, but *sua sponte* granted a temporary waiver, allowing the NYPSC to implement area code overlay in New York City without 10–digit dialing until April 1, 1999. *See N.Y. Dep't of Pub. Serv.,* 13 F.C.C.R. 13,491, ¶ 19, 1998 WL 404248 (July 20, 1998) (petition for expedited waiver of 47 C.F.R. § 52.19(c)(3)(ii)) ("Waiver Order"). Shortly thereafter, New York implemented area code overlay in New York City, and retained 7–digit dialing for local calls within the same area code. On August 14, 1998, the NYPSC sought expedited review by the FCC of the Common Carrier Bureau's denial of a permanent waiver.

In March 1999, the NYPSC sought from this Court a writ of mandamus to compel the FCC to rule on its petitions for reconsideration and its waiver request. On

March 26, 1999, this Court ordered a stay of enforcement in New York of the 10–digit dialing requirement until 1 year following the earlier of either the FCC's ruling on New York's petition for reconsideration and waiver or a panel of this Court's ruling on New York's Petition for a Writ of Mandamus. *New York v. FCC,* No. 99–3015 (2d Cir. March 26, 1999).

On October 21, 1999, the FCC denied the NYPSC's request for reconsideration and waiver of the 10–digit dialing requirement, and reaffirmed its rule that overlay area code plans must include 10–digit dialing for all local calls between and within area codes in areas served by an overlay. *See Third Order,* ¶ 35. The FCC reiterated that

> in an overlay situation, competing exchange service providers, most of which would be new entrants to the market, would have to assign to their customers numbers in the new area code while incumbent LECs would be able to assign to their customers numbers in the old area code. Thus, competitive LECs' customers in the new overlay code would have to dial 10 digits much more often than the incumbent LECs' customers in the old area code, thereby making it less attractive for customers to switch to competitive LECs.

*Id.*

The FCC rejected the NYPSC's argument regarding its authority to condition use of overlay area codes on 10–digit dialing and instead concluded that the 1996 Act "met the Supreme Court's standard for preemption of an activity traditionally regulated by the states." *Id.* ¶ 36. The FCC relied on language in 47 U.S.C. § 251(e), which stated that the Commission was to have "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States," and concluded that this language

gave the FCC the additional authority required to overcome any jurisdictional limitation set forth in the Communications Act. *Id.* (discussing 47 U.S.C. § 152(b)). The FCC emphasized that, although it had delegated authority to the State commissions to implement area code relief, it "retain[ed] authority to set policy with respect to all facets of numbering administration in the United States." *Id.* ¶ 38.

The FCC also rejected the NYPSC's argument that widespread customer confusion would result from 10–digit local calling because customer confusion quickly dissipates. *See id.* ¶ 39. The FCC likewise rejected arguments regarding increased costs involved with 10–digit dialing. *See id.* Regarding the NYPSC's arguments that LNP reduces the competitive disparity without need for 10–digit dialing, the FCC stated that portability does not sufficiently alleviate the dialing disparity between the old area code and the new area code because new customers' numbers, as well as new lines for existing customers, would still be assigned from the overlay. *See id.* ¶ 40.

On November 26, 1999, following publication in the Federal Register of the FCC's order denying reconsideration and the waiver, the NYPSC filed, with its Petition for Review to this Court, an application to extend the stay for 10 months after this Court decides the Petition for Review. The application for a stay was granted by this Court on January 18, 2000, conditioned on NYPSC's implementation or continuation of number portability, number pooling, and a non-discriminatory number assignment system in area code overlay regions. Therefore, as the situation now stands, New York City has adopted overlay area codes, although it has not implemented mandatory 10–digit dialing.

## II. DISCUSSION

We have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342 (2001). The NYPSC's petition for review was timely filed within thirty days of the public notice of the Third Order in the Federal Register.[4] *See* 47 U.S.C. §§ 402(c), 405; 47 C.F.R. § 1.4(b)(1).

### A. *The FCC's Authority to Promulgate the 10–digit Dialing Rule*

The FCC based its assertion of jurisdiction to mandate 10–digit local call dialing in overlay regions (thereby regulating local dialing patterns) on § 251(e) of the Telecommunications Act of 1996, which provides that

> [t]he Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

47 U.S.C. § 251(e) (2001). Section 201(b), a 1938 amendment to the Communications Act of 1934, confers rule-making authority on the FCC: "The Commission may prescribe such rules and regulations as may

---

4. The Third Order was published in the Federal Register at 64 Fed.Reg. 62,983 on November 18, 1999.

be necessary in the public interest to carry out the provisions of this chapter." 47 U.S.C. § 201(b). The 1996 Act left this section intact and the Supreme Court, in *AT & T,* 525 U.S. at 378, 119 S.Ct. 721, held that this rulemaking authority encompassed the 1996 Act's provisions. Also left intact by the 1996 Act, however, was section 152(b), which contains "[e]xceptions to Federal Communications Commission jurisdiction." 47 U.S.C. § 152(b) (2001). The relevant portion of this section provides that "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to ... charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier[.]" *Id.* § 152(b)(1). The interplay between § 152(b) and § 251(e) is at the heart of the NYPSC's challenge to the FCC's assertion of jurisdiction.

The NYPSC principally argues that the FCC's 10–digit dialing rule violates § 152(b)'s prohibition against FCC jurisdiction with respect to "charges, classification, practices, services, facilities, or regulations for or in connection with intrastate communication service" because Congress did not clearly mandate that the state's "traditional powers" over local dialing be preempted. On the other hand, the FCC and the industry intervenors contend that § 152(b) has no application where Congress has expressly given the FCC jurisdiction over intrastate matters, as it has with § 251(e)'s grant of exclusive jurisdiction over the NANP.

The United States Supreme Court, in *Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), framed a similar issue as one of preemption. Federal preemption of state law can occur in several different ways: first, Congress may explicitly provide for preemption; second, Congress's intent to preempt state law may be inferred where the federal regulation in a particular area "left no room for supplementary state regulation;" third, state law is nullified to the extent that it actually conflicts with federal law. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (citations and internal quotation marks omitted). "Where ... the field that Congress is said to have pre-empted has been traditionally occupied by the States we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 715, 105 S.Ct. 2371 (internal quotation marks and citations omitted).[5]

Prior to the 1996 Act, Congress articulated no such "clear and manifest purpose" in the area of intrastate telephone communication; in fact, § 152(b) provided strong evidence against preemption. In *Louisiana Public Service Commission,* 476 U.S. at 377, 106 S.Ct. 1890, the Supreme Court held that, in order to "override the command of § 152(b) that 'nothing in this chapter shall be construed to apply or to give the Commission jurisdiction' over in-

---

**5.** We assume, for purposes of this analysis, that "numbering administration" is a task traditionally performed by states, although we note that this proposition is far from clear. Historically, as described *supra,* many numbering administration tasks were performed first by AT & T, then by the incumbent LECs. The limited role of the State commission was to approve plans developed by the LECs and the NANP Administrator. However, because the FCC conceded that the State commissions played at least some role with respect to local dialing, we assume for this discussion that this area has been "traditionally occupied" by the states. *See Second Order,* at ¶ 315–17.

trastate service," another provision of the statute must supply unambiguous or straightforward language allowing the FCC to act in intrastate matters. Effectuating a federal policy consistent with the Act is not enough to sustain the FCC's authority to act in intrastate matters. *See id.* The Supreme Court's holding in *Louisiana Public Service Commission* thus limited the FCC's ability to assert so-called "ancillary jurisdiction" in intrastate areas where the Act does not specifically grant FCC authority. *See AT & T,* 525 U.S. at 381, 119 S.Ct. 721 (citing *La. Pub. Serv. Comm'n,* 476 U.S. at 370, 374, 106 S.Ct. 1890).

The 1996 Act significantly altered the regulatory landscape. There can be no question "whether the Federal Government has taken the regulation of local telecommunications competition away from the States ... [because] it unquestionably has." *AT & T,* 525 U.S. at 378 n. 6, 119 S.Ct. 721. In *AT & T,* the Supreme Court noted that, after the passage of the Telecommunications Act of 1996, "§ 152(b) may have less practical effect ... because Congress, by extending the Communications Act into local competition, has removed a significant area from the States' exclusive control." 525 U.S. at 381 n. 8, 119 S.Ct. 721. In interpreting § 152(b)'s phrase, "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction," the Supreme Court stated that

> even though "Commission jurisdiction" always follows where the Act "applies," Commission jurisdiction (so-called "ancillary" jurisdiction) could exist even where the Act does not "apply." The term "apply" limits the substantive reach of the statute (and the concomitant scope of primary jurisdiction), and the phrase "or give the Commission jurisdiction" limits, in addition, the FCC's ancillary jurisdiction.

*AT & T,* 525 U.S. at 380, 119 S.Ct. 721. Thus, "[i]nsofar as Congress has remained silent, ... § 152(b) continues to function. The Commission could not, for example, regulate any aspect of intrastate communication not governed by the 1996 Act on the theory that it had an ancillary effect on matters within the Commission's primary jurisdiction." *Id.* at 381 n. 8, 119 S.Ct. 721.

Congress has not remained silent with respect to numbering administration. Section 251(e) explicitly grants the FCC "exclusive jurisdiction" over the North American Numbering Plan and its administration. 47 U.S.C. § 251(e). This explicit grant of authority provides the requisite "unambiguous and straightforward" evidence of Congress's intent to "override the command of § 152(b) that 'nothing in this chapter shall be construed to apply or to give the Commission jurisdiction' over intrastate service." *La. Pub. Serv. Comm'n,* 476 U.S. at 377, 106 S.Ct. 1890. Additionally, as *AT & T* recognized, the 1996 Act specifically injected the FCC into the area of local competition, *see AT & T,* 525 U.S. at 378 n. 6, 119 S.Ct. 721. Section 251(e) falls within this expansion of the FCC's jurisdiction; indeed, § 251 is included within the part of the 1996 Act entitled, "Development of Competitive Markets." Telecommunications Act, 110 Stat. at 61. We therefore conclude that § 251(e) grants the FCC authority to act with respect to those areas of intrastate service encompassed by the terms "North American Numbering Plan" and "numbering administration."

Congress does not conclusively set forth in § 251, however, what either term encompasses. Our next task, therefore, is to determine if these terms, as used by Congress in § 251, provide authority to the

FCC to dictate the number of digits dialed by consumers making local calls.

■ The Supreme Court recently set forth the framework for analyzing an administrative agency's assertion of jurisdiction to regulate. *See FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). "Because this case involves [the FCC's] construction of a statute that it administers, our analysis is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Id.* The first inquiry under *Chevron* is " 'whether Congress has directly spoken to the precise question at issue.' " *Id.* (quoting *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778). If Congress has explicitly resolved the issue, we must " 'give effect to the unambiguously expressed intent of Congress.' " *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). On the other hand, if Congress is silent or ambiguous on the specific issue, we must defer to the agency's reasonable interpretation of the statute it administers. *Id.*

■ The NYPSC contends that Congress's failure to state explicitly that number administration includes regulation of local dialing patterns compels the conclusion that the FCC's authority does not reach local call dialing. Accordingly, the NYPSC asserts, the FCC's interpretation of its authority under the Act is entitled to no deference, because of what the NYPSC characterizes as the Telecommunications Act's clear limits on the FCC's jurisdiction. Because § 251(e) grants the FCC no authority over local call dialing, the NYPSC's argument goes, we must give effect to § 152(b)'s plain reservation to the states of jurisdiction over intrastate matters.

Although the NYPSC correctly points out that § 251(e) does not explicitly mention "local dialing patterns" as within the scope of FCC's "exclusive jurisdiction" over the North American Numbering Plan, this absence by no means makes the statute itself or Congress's intent clear. As the Supreme Court in *AT & T* noted, the 1996 Act is "not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction." *AT & T,* 525 U.S. at 397, 119 S.Ct. 721. What constitutes "numbering administration" or is encompassed by the NANP under § 251(e), given the FCC's "exclusive jurisdiction" and its authority to "delegat[e] to State commissions ... all or any portion of such jurisdiction" is far from clear. The Supreme Court in *AT & T,* applying *Chevron* deference to the FCC's interpretation of several other subsections of § 251, recognized that "Congress is well aware that the ambiguities it chooses to produce in a statute will be resolved by the implementing agency. ,We can only enforce the *clear limits* that the 1996 Act contains...." *Id.* (emphasis added). We therefore will uphold the FCC's interpretation of "numbering administration" and "North American Numbering Plan" so long as it is reasonable.

The FCC and the industry intervenors urge that establishment of local dialing patterns and a uniform telephone numbering system are included in the term "numbering administration," as the term is used in § 251. We agree with the FCC and the industry intervenors that such an interpretation is reasonable. Including local dialing patterns within the scope of the "North American Numbering Plan" is eminently logical. The FCC points out:

> The numbering system necessarily requires a degree of uniformity in telephone numbers, including the number of digits to be assigned as area codes (3), central office codes (3), and individual subscriber codes (4)....

That the number of digits dialed is a function of numbering administration is demonstrated by New York's own request that the Commission "formally investigate" the "feasibility of eight digit telephone numbers," because such a dialing pattern would "increase the supply of numbers 10–fold."

Respondent's Br. at 23, 25 (quoting the NYPSC's Petition for Reconsideration). Because it is reasonable to interpret "numbering administration" as including all dialing patterns, local and interstate, we conclude that the FCC's rule should be upheld as a permissible construction of § 251(e).[6]

The FCC points out that, even prior to the 1996 Act's grant of "exclusive jurisdiction" over the NANP, it had a role in assuring that "numbering resources of the NANP [we]re administered in a fair and efficient manner that ma[de] them available to all parties desiring to provide telecommunications services." *NANP R & O*, ¶ 4. Thus, the FCC had instituted "broad policy objectives" that provided:

> Administration of the plan must seek to facilitate entry into the communications marketplace by making numbering resources available on an efficient, timely basis to communications services providers.

Administration of the NANP should not unduly favor or disadvantage any particular industry segment or group of consumers....

Administration of the NANP and the dialing plan should give consumers easy access to the public switched telephone network.

*NANP R & O* ¶ 15 (reiterating a prior order which rejected a proposal that would discriminate against wireless technologies by assigning new NPAs for them, *see Proposed 708 Relief Plan and 630 Numbering Plan Area Code by Ameritech–Illinois*, 10 F.C.C.R. 4,596, 1995 WL 27204 (January 23, 1995) ("Ameritech Order")). In the Ameritech Order, the FCC described its jurisdiction over the NANP prior to the 1996 Act, and found that "it is a practical and economic impossibility to separate NPAs for local use from NPAs for interstate use. Not only are NPAs scarce resources, but also, it would be technologically impossible to have separate NPAs for interstate and intrastate telephone calls." Ameritech Order, ¶ 14. We believe that the FCC's interpretation of § 251, especially when viewed along with its prior interpretations regarding the NANP—which preceded Congress's grant of exclusive jurisdiction over the NANP to the FCC—is permissible and reasonable.[7]

---

**6.** NYC's argument that *City of Dallas, Texas v. FCC*, 165 F.3d 341, 347–48 (5th Cir.1999) provides support for its position that the FCC had no authority to promulgate this regulation is without merit. *City of Dallas* is readily distinguishable, because the court concluded that the statute's "plain meaning" prevented the FCC from enacting the cable regulations at issue there. Because *Chevron* deference applies here (since no such statutory "plain meaning" exists to prevent deference to the reasonable interpretation of the FCC) as to the scope of the FCC's exclusive jurisdiction, NYC's argument that *City of Dallas* prevents preemption in this case is unavailing.

**7.** The industry intervenors press another argument regarding the FCC's jurisdiction based on the first sentence of § 251(e), which provides, "The Commission shall create or designate one or more impartial entities to *administer telecommunications numbering and to make such numbering available on an equitable basis.*" 47 U.S.C. § 251(e)(1) (2001) (emphasis added). First, they point out that because the statutory definition of "telecommunications" in 47 U.S.C. § 153(43) does not distinguish between intra- and interstate communications, jurisdiction over "numbering" must include both inter- and intrastate calls. *See id.* § 153(43) (defining "telecommunications" as "the transmission, between or among points specified by the user, of infor-

The NYPSC's argument to the contrary is unavailing. The NYPSC contends that the FCC's "exclusive jurisdiction" does not extend to local dialing patterns, because they are separate from the NANP, which only includes ensuring an adequate supply of telephone numbers.[8] The NYPSC cites to the Eighth Circuit's decision in *California v. FCC*, 124 F.3d 934, 943 (8th Cir. 1997), *rev'd in part on other grounds by AT & T*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), as support for its argument that the NANP does not encompass local dialing patterns.[9] In *California*, however, the Eighth Circuit merely stated that "[n]umbering administration involves the coordination and distribution of all telephone numbers in the United States." *Id. California* never actually addressed the FCC's power pursuant to § 251(e), because the petitioners' challenge to the FCC's rule, promulgated pursuant to § 251(e)(2), was not ripe. *See id.*

■ NYPSC's reliance on an industry document, *BOCs Notes on the LEC Networks* is likewise misplaced. *BOCs Notes on the LEC Networks—1994*, contained in Petitioner's Ex. 1. First, the NYPSC makes much of the fact that the section on the NANP is entitled "Numbering Plan and Dialing Procedures," contending that the numbering plan is distinct and separate from dialing procedures. Additionally, the NYPSC points to the *BOCs Notes'* definition of dialing procedures as the "*use* of certain digits or special characters as prefixes or appendices to the number address defined by the NANP or its equivalent elsewhere in the world." *Id.* § 3.8 (emphasis in original). This definition alone, culled from an industry document, does not render unreasonable the FCC's conclusion that dialing patterns are part of the NANP, as that term is used in the *statute.* As *Chevron* dictates, we must defer to an agency interpretation so long as that interpretation is based on a permissible construction of the statute. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Given the strong pro-competitive purpose of and significant increase in the FCC's authority pursuant to the 1996 Act, it is

---

mation of the user's choosing, without change in the form or content of the information as sent and received"). Second, they argue that the FCC's responsibility to ensure numbers are available on an "equitable basis" supports its exercise of jurisdiction over local dialing. Without mandatory 10–digit dialing, it is argued, numbers from the new area code are less valuable than numbers from the old area code, placing the carrier with more old numbers (the incumbent LECs) at an advantage over new carriers, an inequitable result. Although this argument is appealing, we need not reach it because we conclude that the FCC's jurisdiction is properly based on its "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States." *Id.* § 251(e)(1).

8. The CPB further argues that local dialing is a "practice" under 47 U.S.C. § 152(b), not subject to FCC authority under § 251(e). We reject this argument as we have already concluded that § 251(e) provides an explicit grant of jurisdiction to the FCC, not controlled by § 152(b).

9. The NYPSC also argues that § 251(e) should be read in conjunction with § 271, which includes a checklist for Bell operating companies (BOCs) to meet before they are allowed entry into the long-distance market. *See* 47 U.S.C. § 271. Section 271(c)(2)(B)(ix) states that BOCs must provide, "[u]ntil the date by which telecommunications numbering administration guidelines, plan or rules are established, nondiscriminatory access to telephone numbers for assignment to the other carrier's telephone exchange service customers." *Id.* The NYPSC argues that, when read together, "numbering administration" means the allocation of telephone numbers, not local dialing patterns. Although the NYPSC correctly describes what § 271 provides, it fails to explain why § 271 is relevant to the determination at issue here, or why § 271's reference to numbering administration necessarily *excludes* dialing patterns.

not unreasonable to conclude that Congress's use of the term "North American Numbering Plan" encompasses more than the BOCs' use of that term.

Additionally, the principal purpose of the 10–digit dialing rule, as repeatedly stated by the FCC, is to ensure competition in the local telecommunications markets. As we noted earlier, the 1996 Act itself indicates that it is an "act to promote competition." Telecommunications Act, 110 Stat. at 56. Additionally, the Supreme Court concluded that the 1996 Act "unquestionably" grants the FCC authority to regulate local telecommunications markets. *AT & T*, 525 U.S. at 378 n. 6, 119 S.Ct. 721. These statements bolster the FCC's view of its authority to impose the 10–digit dialing requirement, a pro-competitive regulation. For this additional reason, the FCC's assertion of jurisdiction over local dialing patterns is reasonable.

In short, the NYPSC's arguments do not convince us that the FCC's interpretation of "numbering administration" and the "North American Numbering Plan" is impermissible under the 1996 Act. Because the FCC's interpretation is reasonable, we defer, as we must, to the FCC's assertion of jurisdiction under § 251(e) to promulgate a rule pertaining to local dialing patterns.

### B. *The FCC's Promulgation of the 10–digit Dialing Rule*

■ Having concluded that the FCC possessed jurisdiction to promulgate rules pursuant to § 251 generally with respect to local dialing patterns, we would normally now turn to the question of whether the specific rule passes muster.

However, the petitioner in this case, the NYPSC, argues only that the FCC rule is invalid as exceeding its authority. The City of New York, as an intervenor, argues that the FCC's rule is an unreasonable

exercise of the FCC's rule-making authority. The FCC submits that NYC's argument need not be addressed because it was not raised by the party to this case, the NYPSC. Although we believe that the FCC's argument is correct, *see La. Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 224 n. 5 (D.C.Cir.1999) ("An intervening party may join issue only on a matter that has been brought before the court by another party."), we can easily dispose of this argument on the merits.

■ Contrary to the City of New York's argument, the FCC's rulemaking was not arbitrary and capricious. The 10–digit dialing rule was based on the FCC's determination that to allow seven digit local dialing would have anti-competitive effects by favoring the incumbent LECs. *See Second Order*, ¶¶ 287, 289. After reviewing the submitted comments, the FCC reasonably concluded that without 10–digit dialing

[c]ustomers would find it less attractive to switch carriers because competing exchange service providers, most of which will be new entrants to the market, would have to assign their customers numbers in the new overlay area code, which would require those customers to dial 10–digits much more often than the incumbent's customers, and would require people calling the competing exchange service provider's customer to dial 10–digits when they would only have to dial 7–digits for most of their other calls.

*Id.* ¶ 287.

In its third order, the FCC considered and rejected the NYPSC's arguments that long-term local number portability will eradicate the anti-competitive effects of an overlay area code, finding that the dialing disparity between new area code customers and old area code customers still exists

because incumbent LECs have access to a larger pool of old area code numbers. *See Third Order*, ¶¶ 40, 41. That the public would be initially inconvenienced by adjusting to dialing 10–digits for all local calls was likewise considered by the FCC, but it concluded that such customer confusion quickly dissipates. *See id.* ¶ 39.

The NYPSC, in its brief, concedes that "[t]he NANP defines telephone numbers as ten-digits long, reserves certain numbers for special purposes, and provides for the assignment of new area codes to ensure that enough ten-digit numbers are available for assignment to customers." The NYPSC itself therefore impliedly recognizes that the FCC has "exclusive jurisdiction" over the assignment of new area codes. The only reason that the NYPSC has *any* authority to implement overlay area codes in New York City is because the FCC exercised its authority under § 251(e) to delegate to State commissions the power to implement area code relief. We believe that the imposition of 10–digit dialing is a valid condition on this delegation, which allowed New York to implement area code overlay in the first place. The industry intervenors point out that the FCC was not required to delegate this authority, and could, in fact, have assigned particular methods of area code relief to the States under § 251(e) or prohibited area code overlays altogether. This "greater power includes the lesser power" argument lends further support to the conclusion that the FCC's promulgation of 47 C.F.R. § 52.19 was a reasonable exercise of the FCC's authority under § 251(e).

In reviewing agency action,

[this Court] must be satisfied that the agency examined the relevant data and established a rational connection between the facts found and the choice made. The agency's action should only be set aside where it relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the products of expertise.

*Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 89–90 (2d Cir.2000) (internal citations and quotation marks omitted). We are satisfied that the FCC, in promulgating this rule, appropriately assessed all relevant factors. Given the deference accorded the FCC's action, the FCC's rule cannot be said to be arbitrary and capricious.

### C. Denial of Waiver to the NYPSC

A waiver of an FCC rule may be granted "for good cause shown." 47 C.F.R. § 1.3. "The FCC may exercise its discretion to waive a rule where particular facts would make strict compliance inconsistent with the public interest." *Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C.Cir.1990). "Challenging the denial of a waiver is ... not an easy task because an applicant for waiver bears the heavy burden on appeal to show that the Commission's reasons for declining to grant the waiver were so insubstantial as to render that denial an abuse of discretion." *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C.Cir.1999) (internal quotation marks and citations omitted).

Regarding New York's waiver petition, the FCC concluded that the Common Carrier Bureau's denial "was entirely consistent with the Act, our regulations, precedent and policy." *Third Order*, ¶ 45. In challenging this denial, the NYPSC first argues that the FCC erred in treating its waiver request merely as an appeal from the FCC Common Carrier Bureau's denial, and claims that it also renewed its waiver request. The NYPSC therefore argues

that the FCC failed to address the merits of the waiver request and that this failure was "arbitrary and capricious" because the FCC treated its request as an attempt to overturn the 10–digit dialing rule. The FCC *did* address the merits of the NYPSC's waiver request (albeit briefly), however, when it stated that the Bureau's denial of a waiver was consistent with "the Act, our regulations, precedent and policy" and thereby adopted the Bureau's reasoning in denying the waiver. *Third Order*, ¶ 45.

Second, as to the merits of the waiver request, the NYPSC argues that 10–digit dialing is unnecessary in New York City, because New York City is the "mecca of local telephone competition." The NYPSC points to a December 22, 1999 finding by the FCC that New York's local telephone network was open to competition, such that Bell Atlantic was permitted to provide long-distance service under § 271. *See Application by Bell Atlantic N.Y. for Authorization Under Section 271 of the Communications Act to Provide In–Region, InterLATA Serv. in the State of N.Y.*, 15 F.C.C.R. 3,953, 1999 WL 1243135 (December 22, 1999), ¶¶ 6, 13 (concluding that "New York . . . has been a leader in opening local markets to competition for over fifteen years" and "[t]he well established pro-competitive regulatory environment in New York in conjunction with recent measures to achieve section 271 compliance has, in general created a thriving market for provision of local exchange . . . service."). Additionally, the NYPSC asserts that its imposition of permanent LNP, which would allow customers of the incumbent LEC to keep their number when switching to another new entrant, alleviates any anti-competitive concerns. Also, the NYPSC contends that its requirement of non-discriminatory number assignment, under which the competitive LECs' new customers are no more likely to receive telephone numbers in the new overlay area codes than if they remained customers of Bell Atlantic, the incumbent LEC. Additionally, NYPSC argues that, although Bell Atlantic has more numbers in the existing area codes, competitors have a supply of unused numbers in proportion to their market share. Finally, the NYPSC, joined by intervenors CFA and NYC, argues that 10–digit dialing would impose needless costs and inconvenience on New York City residents, chiefly in reprogramming automatic dialing equipment such as modems, fax machines, fire and burglar alarms.

The FCC considered and rejected each of these arguments. We do not find the FCC's refusal to grant the requested waiver an abuse of its discretion. First, even with New York's advances in local telephone service competition and the NYPSC's pro-competitive conditions, including the LNP, non-discriminatory number assignment, and number pooling, concerns about maintaining competition remain. For instance, without 10–digit dialing, the dialing disparity between numbers in the old and new area codes remains. Second, regarding the argument on consumer inconvenience, the FCC's Common Carrier Bureau noted, and we agree, that "implementation of any new area code, whether through an overlay, a geographic split, or a rearrangement of existing area code boundaries, is initially confusing, not only to customers in the affected area, but also to those who call them from outside that area." *Waiver Order*, ¶ 14. Finally, as the FCC points out, many of the arguments asserted by the NYPSC to support its waiver application were also pressed in its challenge to the rule itself. These arguments fail in this context for the same reasons that they failed in that context.

In short, the Common Carrier Bureau's decision and the FCC's adoption of that order adequately considered all of NY's arguments in support of its waiver application. We uphold the denial of the waiver, and conclude that the FCC's reasons cannot be considered "so insubstantial as to render that denial an abuse of discretion." *Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 517 (D.C.Cir.1999) (internal quotation marks and citations omitted).

### III.  CONCLUSION

For the foregoing reasons, we affirm the FCC's exercise of jurisdiction over local dialing and its imposition of mandatory 10-digit dialing for those areas adopting area code overlays.  Although New York has long resisted this rule, New York City will thus soon join the ranks of several major metropolitan areas, including Boston, Philadelphia, Pittsburgh and Denver, that have implemented 10-digit local call dialing apparently without great incident.

The NYPSC's petition to review seeking an order setting aside the FCC's orders is hereby DENIED.